[Civ. No. 9141. First Appellate District, Division Two.—September 30, 1933.]

In the Matter of the Estate of ADELAIDE L. ESCOLLE, Deceased. JULIA PYBURN et al., Appellants, v. ALICE E. WHITE et al., Respondents.

James M. Thomas for Appellants.

Robert L. Mann for Respondents.

DOOLING, J., *pro tem.*—Two appeals are herein presented, one from an order of the superior court, sitting as a court of probate, overruling objections to the administratrix's final account and settling the same, and the other from an order denying appellants' petition for an order directing respondents to turn over to the estate certain shares of stock claimed by appellants to be the property of such estate. The latter order was made on the ground that the court, sitting as a court of probate, had no jurisdiction to adjudicate and determine the subject matter alleged in said petition.

The decedent, Adelaide Escolle, died on August 27, 1929, aged seventy-one years. After her death respondent Alice E. White, a sister of decedent, was duly appointed administratrix of her estate. During her lifetime the decedent had been the owner of twenty shares of the capital stock of respondent The Escolle Estate Company, a corporation, and it is the question of title to this stock which was sought to be determined in the proceedings leading to the two orders herein appealed from. It is appellants' contention that this stock was the property of decedent at the time of her death. It is respondents' contention, on the other hand, that by virtue of a gift *causa mortis* made by decedent on August 24, 1929, this stock became the property of respondents Alice E. White, Marie E. Lucke, Charles B. Escolle, Joseph Escolle, Henrietta E. Atkinson and Victoire M. Mercer, in equal shares. The named respondents are brothers and sisters of the decedent, and the appellants are the children of a predeceased sister.

We shall first take up the consideration of the appeal from the order denying appellants' petition for an order directing respondents to turn over to the estate the shares of stock. It is urged by respondents that this is not an appealable order, but we do not feel called upon to decide that question, since we are satisfied that the order was correctly made and must be affirmed. The petition leading to this order was filed pursuant to sections 613, 614 and 615 of the Probate Code. These sections are a reenactment in substantially the same language of sections 1459, 1460 and 1461 of the Code of Civil Procedure as they existed prior to the adoption of the Probate Code. To the petition

respondents filed an answer in which they severally claimed title to three and one-third shares of the disputed stock apiece, and upon the hearing of such petition these claims were supported by evidence of a gift *causa mortis* hereinafter to be noticed.

In *Koerber* v. *Superior Court,* 57 Cal. App. 31 [206 Pac. 496], the court expressly held that in a proceeding under sections 1459, 1460 and 1461 of the Code of Civil Procedure the superior court, sitting as a court of probate, cannot try and determine questions of title to personal property, the court saying at page 34:

"The main question presented by this proceeding is whether or not the court, sitting in probate, in the exercise of its jurisdiction pursuant to sections 1459, 1460 and 1461 of the Code of Civil Procedure, may try and determine questions of title to personal property. The trial court expressed grave doubts about it and, in view of the decisions of the Supreme Court of this state, there can be no question that such power does not exist, and that any attempt to exercise such authority is in excess of the probate jurisdiction. (Citing cases.)

"It has also been held in other jurisdictions, in construing statutes similar to ours, that the power of the probate court ends with the discovery of the property and the enforcement of the remedial provisions of the statute, and does not extend beyond that so as to allow the court to adjudicate the title to disputed property."

In reenacting sections 1459, 1460 and 1461 of the Code of Civil Procedure in substantially the same language as sections 613, 614 and 615 of the Probate Code, the legislature is presumed to have done so in view of the construction previously placed on those sections of the Code of Civil Procedure by the courts and to have adopted that construction as a part of the reenacted law. (23 Cal. Jur., pp. 795, 796, sec. 173.)

Appellants attempt to distinguish the case on appeal from *Koerber* v. *Superior Court, supra,* on its facts. No such distinction is logically possible. Both cases follow the same pattern and it is immaterial that in this case the claim of title adverse to the estate is based on a claimed gift *causa mortis* and in the Koerber case the claim adverse to the estate was grounded on a gift *inter vivos.* The essential

feature in both cases is the claim of title adverse to the estate. It was squarely held in the Koerber case that the probate court is without jurisdiction to determine the question of title in the statutory proceeding formerly provided for in section 1459 et seq. of the Code of Civil Procedure, now superseded by section 613 et seq. of the Probate Code. It seems clear that the court properly denied appellants the relief sought by their petition on the ground of lack of jurisdiction.

■ Turning to the appeal from the order overruling appellants' objections to the final account of the administratrix and settling her account, it is the law that on the settlement of such account the probate court can determine disputed questions of title between the administratrix and the estate. (*Estate of Roach,* 208 Cal. 394 [281 Pac. 607].) The administratrix failed to include the disputed stock in her account and appellants objected to the account on that ground. On the issue thus made evidence was introduced, some of it conflicting. In view of the trial court's determination of the issue in favor of the administratrix we are bound on appeal to consider the evidence most favorable to the administratrix, resolving all conflicts in the evidence in support of the order of the trial court. Treating the evidence in this fashion we find competent evidence to support the following statement of facts:

On August 24, 1929, the decedent was confined to bed in the French Hospital awaiting a capital operation. She summoned Mr. Robert L. Mann, who was her attorney, to her bedside. Mr. Mann arrived at the hospital between 12:30 and 1 o'clock in the afternoon. At that time Mr. Mann testified as to the decedent's mental condition: "Her mind was extremely clear. She knew just what she wanted to do. She discussed her affairs with me fully and comprehensively." Decedent had prepared, in her own handwriting, prior to Mr. Mann's arrival, two documents, to which we shall hereinafter refer as document 1 and document 2. Document 1 read as follows:

"Saturday, August 24, 1929.
"Bank of Italy Safe Deposit.
"Be sick at the hospital. I have given orders to my sister, Mrs. White, to go to my safe deposit box and get

me a few papers, so please allowed her to go in my box vault. Kindly oblige,

"ADELAIDE ESCOLLE."

Document 2, which was on two separate sheets of paper, read, omitting the printed letter-head of the French Hospital:

"August 24, 1929.

"I Adelaide Escolle say that if anything happen to me, I leave the Escolle State stock to all my Sisters and Brothers, share and share alike—all of the Escolle state Holders—that is Marie Lucke, Alice White, Victoire Mercer, Henrietta Atkinson, Charles Escolle and Joseph Escolle.

"ADELAIDE L. ESCOLLE.

"Those are my orders—all the rest dispose as you all think best. I trust in you all—I sign this myself—

"ADELAIDE ESCOLLE."

and on the second sheet:

"August 24, 1929.

"I adelaide Escolle if anything happen to me I leave them my stock of the Escolle State Company

"ADELAIDE L. ESCOLLE."

The dates on the two sheets of document 2 were added by decedent after the arrival of Mr. Mann, under circumstances to be hereafter related. When Mr. Mann arrived at the bedside of decedent she handed Mr. Mann the two sheets composing document 2, which were then undated, and handed document 1 to respondent, Alice E. White. At the same time, according to Mr. Mann's testimony, "she handed her the key to the safe-deposit box, and said to me that she was making a gift of her stock in the Escolle Estate Company to her six brothers and sisters who had stayed in the estate, and hadn't sold out, and that we were to go down and obtain access to that box and get that stock, and Mrs. White was to hold it". When the two sheets constituting document 2 were handed to Mr. Mann he noticed that they were not dated. He testified as to this: "I said to Miss Escolle, 'Why don't you make a will? You told me you are going to be operated on this afternoon on a major operation. I should advise making a will.' She said, 'I don't wish to make a will, nor I don't wish to have my estate in probate, because my brother Leon's estate went into probate and it was so expensive and troublesome that

I want to avoid that if I can. Therefore, I am making a gift now of this stock to those who stayed in the Escolle Estate Company and here is a writing which sets out a memorandum of that gift.' I said, 'Miss Escolle, you told me that some of your relatives, the Pyburns, are liable to attack this gift and this memorandum of gift,' and I said I would advise that this document be put in the form of a holographic will, so that in case they should be successful in attacking it as a memorandum of gift, it could still stand as a will. Whereupon she dated both sheets of paper in her own handwriting, and the rest of it is, as I know, also in her own handwriting. She was also careful to sign each sheet with her signature. . . . Her instructions were to me that it was not to be offered as a will unless the gift should be upset. I am endeavoring to carry out those instructions.''

Armed with the key to the safe deposit box and document 1, respondent Alice E. White and Mr. Mann went to the bank on Saturday afternoon but were unable to gain access to the box. Mrs. White returned to the bank on Monday, got the certificates of stock, which had some time previously been indorsed in blank, and left them in Mr. Mann's office. Some time after decedent's death the certificates were canceled and certificates for three and one-third shares each issued to the six respondents in lieu thereof.

On the same Saturday afternoon, after Mr. Mann and Mrs. White had left the hospital, decedent told respondent Victoire Mercer that she had ''given us the stock of the Escolle Estate Company, to her six brothers and sisters. . . . She told me, 'give my stock to the two boys and the four girls'. . . . Mrs. White had left with Mr. Mann to go to the safe-deposit box to get the papers which she had authorized Mrs. White to do so. . . . She told me so herself. . . . She said that she made a gift, that she gave us the stock of the Escolle Estate Company to her two brothers—to the six of us—the four sisters; and she said that Mr. Mann insisted on her making a will. She said, 'I don't want a will. I told Mr. Mann I didn't want any will', and she seemed kind of put out about it, that Mr. Mann should mention it about a will. . . . She told me, 'Remember', she said, 'if I don't die, I want my stock back', and I said, 'Oh,

Adelaide, don't talk that way'. 'Well,' she said, 'you know I am pretty old to be operated'."

Appellants claim that there is an essential element of a gift *causa mortis* absent from the evidence in that "there is not a scintilla of evidence throughout the whole record that delivery of said stock had been made and that she intended to make delivery of said stock". In order to constitute a gift *causa mortis* there must be a delivery of the subject of the gift (13 Cal. Jur., p. 44), but the delivery may by symbolic and "delivery by decedent of the key to his safe-deposit box to the donee constitutes a sufficient symbolical delivery of the contents of the box to sustain a gift, unless the contents were of such a nature, and the conditions and circumstances were such, that they could then and there be delivered into his actual possession". (28 C. J., pp. 692, 693, sec. 106.) Such delivery may be made to a third person for the benefit of the donee. (28 C. J., p. 94, sec. 109; *Coward* v. *De Cray,* 38 Cal. App. 290 [176 Pac. 56]; *Ruiz* v. *Dow,* 113 Cal. 490 [45 Pac. 867]; *Beals* v. *Crowley,* 59 Cal. 665.)

Applying these rules to the facts, there is ample evidence to support a finding of delivery and of intent to make delivery. Decedent gave the key of her safe deposit box to Mrs. White with a written order to allow her access to it and she at the same time said that Mrs. White was to go down and get that stock and "was to hold it". Afterwards she told Mrs. Mercer that she had made a gift to her and the other sisters and brothers of the stock and that Mrs. White had left with Mr. Mann to go to the safe deposit box to get the papers which she had authorized Mrs. White to do and that "if I don't die I want my stock back". She gave Mrs. White the power and authority to get the stock and hold it. This was sufficient under the circumstances to constitute a delivery to Mrs. White for her benefit and that of the other donees. That decedent intended a delivery is clear from her statement to Mrs. Mercer: "Remember, if I don't die I want my stock back." Unless she had intended a present delivery to Mrs. White that statement would have been superfluous. As it is, it constitutes a fair statement of the effect of a gift *causa mortis,* i. e., "one which is made in contemplation, fear or

peril of death, and with intent that it shall take effect only in case of the death of the giver". (Civ. Code, sec. 1149.)

■ Appellants' argument that the language of document 1, "I have given orders to my sister, Mrs. White, to go to my safe-deposit box and get me a few papers," indicates an intent that Mrs. White should bring whatever papers she should get to decedent and negatives an intent that Mrs. White should take and hold the stock, is answered by Mr. Mann's testimony that after document 1 was written decedent told Mrs. White to get the stock and hold it. It was decedent's intention existing and expressed at the time the key and document 1 were delivered to Mrs. White which is controlling, and if there is any inconsistency between the written order and the later expressed intention, which we need not decide, the later expressed intention coupled with the symbolic delivery must control. (*Ruiz* v. *Dow, supra,* at p. 497.)

■ Appellants further argue that document 2, being in form a good holographic will, is inconsistent with the intention to make a gift *causa mortis* and that respondents must take, if at all, under the will and hence could only take through the probate of that document. But the evidence is clear that decedent intended and made a gift *causa mortis* and that document 2 was only dated so as to make it valid as a holographic will at the insistence of the attorney and that decedent expressed a desire that the document be offered for probate only in case the gift should for some reason be held invalid. A not dissimilar case on its facts is *Darling* v. *Emery,* 74 Vt. 167 [52 Atl. 517], where, after a gift *causa mortis,* the attorney suggested the making of a will to the same effect. The will was defective and it was argued that the transaction was entire and the will having failed there could be no gift. The court held that there was nothing inconsistent between the gift and the will either in fact or in law and sustained the gift, although the will failed. That case is quite apposite here. The evidence makes plain that decedent intended to make a gift *causa mortis* and the will was only an added precaution to accomplish the same result in case the gift for any reason failed. The gift having been effective, the title to the stock passed to respondents thereby and the will could not become operative in so far as the stock was concerned.

Appellants make some further arguments which depend upon the weight and construction of the evidence. Finding sufficient evidence to support the trial court's order this court may not weigh, or inquire into, the evidence further.

The orders appealed from are affirmed.

Nourse, P. J., and Spence, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on November 27, 1933, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 27, 1933.